UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

IN RE:                          )
                                )
    LEE H. PURDY                )    CASE NO.  12-11592
                                )
                Debtor(s)       )

## MEMORANDUM-OPINION

This matter came before the Court for an evidentiary hearing on the following Motions:

Motion of Creditor Citizens First Bank ("CFB") to Prohibit Use of Cash Collateral;
Motion of CFB for Relief from the Automatic Stay on Livestock and Farm Equipment;
Motion of Sunshine Heifers, LLC ("Sunshine") to Extend Time to Assume or Reject Unexpired Leases; and
Motion for Relief from Stay on Livestock.

The Court determined at the hearing that a decision regarding whether the Sunshine documentation constitutes a true lease or a disguised financing transaction, as well as the post-petition effect of the milk assignments, must be made prior to a decision on the other pending matters.

Therefore, the Court reviewed the entire record, considered the testimony of the witnesses, Debtor Lee Purdy ("Debtor"), Karissa Peterson, Becky Moore, Jeff E. Blevins, Martin Anthony Martinez and the depositions of Linus Kuennen and Kendall Branstetter. For the following reasons, the Court **DENIES** Sunshine's Motions to Extend Time to Assume or Reject Unexpired Leases and for Relief from Stay on Livestock and by separate Order reschedules CFB's Motions to Prohibit Use of Cash Collateral and Relief from the Automatic Stay for hearing. An Order incorporating the findings herein accompanies this Memorandum-Opinion.

## I. **FINDINGS OF FACT**

Debtor is a dairy farmer who currently operates on property he leases from Martin Martinez in Cave City, Kentucky. In 2008, Debtor entered into a loan agreement with CFB pledging, among other things, his dairy cattle herd as collateral. In 2009 Debtor refinanced the loan, executing a new Promissory Note in the amount of approximately $460,000 and on July 3, 2009, an Agricultural Security Agreement ("Agreement"). Pursuant to the Agreement Debtor granted CFB a:

> Purchase Money Security Interest in all Chattel Paper, Accounts, Equipment, Farm Products, Livestock (including all increase and supplies) and Farm Equipment currently owned hereafter acquired located on his farm at 884 Hiseville Road, Cave City, Barren Co., Ky., and located at other real estate.

See, JT Index. No. 1. On July 6, 2009, CFB filed a Financing Statement with the Kentucky Secretary of State perfecting its security interest referenced above. For identification, CFB required its livestock collateral to bear white ear tags and by the terms of the Agreement and Financing Statement, its lien extended to all livestock on the farm then owned by Debtor and thereafter acquired.

On August 19, 2010, Debtor and CFB executed an Agricultural Security Agreement in which Debtor granted CFB a security interest in the following:

> All Crops, Farm Products and Livestock (including all increase and supplies) currently owned and hereafter acquired including but not limited to all dairy cattle currently owned and hereafter acquired regardless of location of cattle. . . .

See, JT Ex. 3. On September 1, 2010, CFB filed a UCC Financing Statement with the Kentucky Secretary of State perfecting its security interest referenced above.

On May, 31, 2012, Debtor and CFB executed an Agricultural Security Agreement in which Debtor gave CFB a security interest in "All Farm Products." See, JT Ex. 5. On June 26, 2012, CFB

filed a UCC Financing Statement with the Kentucky Secretary of State perfecting its security interest referenced above.

At the time of the hearing, Debtor had outstanding loans of approximately $455,000, $153,000 and a $40,000 line of credit with CFB. Debtor held only one bank account and that was with CFB. All business cash from whatever source derived was deposited in the CFB account. All disbursements made by the Debtor were made from this same account.

    A.  <u>Dairy Cow Leases</u>.

While utilizing the CFB loans for operations, Debtor decided he wanted to increase his herd. Debtor met with Jeff Blevins of Sunshine, a knowledgeable dairy farmer and financier, at Debtor's operation. During May and June of 2009, 45 head of cattle were delivered to the farm. This small group of stock had been recovered by Blevins from a farm upon which he had foreclosed. 16 of those cows were unfit and had to be culled from the herd. Blevins bought replacements from Darol Hartzler and supplied them to Debtor. Debtor paid Blevins by check for the cattle. Blevins accepted the check for payment. Nearly three months after the cows were delivered to Debtor's farm, on August 7, 2009, Debtor and Sunshine executed a "Dairy Cow Lease" ("Lease 1") and a Security Agreement in connection with the Lease which identified the collateral as:

> All cows, heifers, offspring or replacements including, but not limited to cattle on Exhibit "A" attached.

<u>See</u>, Sunshine Ex. 6. Debtor, however, scratched out the term "heifers" and the term "offspring" in the description of the collateral.

On December 15, 2010, Debtor entered into a "Dairy Cow Lease" ("Lease 2") with Sunshine for 240 head of Holstein heifers for a term of 50 months. Debtor had 2 cattle buyers, Danny Layton and Kendall Branstetter, find these cattle and purchase them for Debtor. Once the cows were

-3-

delivered to Debtor's farm he began milking and caring for them.  Sunshine later sent Debtor a check which he used to reimburse Layton and Branstetter for the cattle purchases.  The parties also entered into a Security Agreement and a Financing Statement covering the 240 cows.  See, Sunshine Ex. 1.    In July 2011, Debtor had Linus Kuennen purchase 50 head of cattle for him.  Kuennen selected the cattle for Debtor.  Sunshine wrote Kuennen a check for the cattle.  On July 22, 2011, Debtor entered into a "Dairy Cow Lease" ("Lease 3") with Sunshine for this 50 head of cattle for a term of 50 months.  On cattle purchased by Linus Kuennen for Debtor, the cattle were branded and tagged on behalf of Sunshine prior to delivery to Debtor's farm pursuant to the terms of Lease 3.

On July 14, 2012 Sunshine had Debtor enter into a "Dairy Cow Lease" ("Lease 4") to cover 285 head of cattle as documentation to "wrap up" the cattle covered by Leases 1 and 2.

Debtor testified that in May 2012, he asked Blevins if he had built up enough equity to acquire more cattle although Blevins testified that he never saw his transactions with the Debtor involving "equity."  Nevertheless, Blevins checked and told him if he paid $1,500 more per month, he could acquire another 100 head of cattle.  On July 14, 2012, Debtor entered into a "Dairy Cow Lease" ("Lease 5") with Sunshine for 100 head of cattle for a term of 50 months.  Kendall Branstetter purchased the 100 head from different places and they were placed on Debtor's farm between June and July 2012.  Debtor paid Branstetter for the cattle.  Sunshine eventually sent a check to Debtor for the money he had advanced Branstetter to purchase the cattle.  The cattle, however, had already been delivered to Debtor's farm and he was milking and caring for them prior to the time Sunshine sent the check to Debtor.  The cattle purchased and delivered to Debtor by

Layton and Branstetter, however, were branded with Sunshine's brand and tagged by Debtor and his employees after they reached Debtor's farm.

In addition to the above referenced purchases, Debtor purchased other cattle using funds from the CFB bank account that had no relationship to a Sunshine lease. At one point by mistake, all cattle that came onto the farm were branded by Debtor's employees with the Sunshine brand. After a time, misbranding and tagging resulted in the inability of anyone to distinguish cows purchased with funds deposited in the CFB account from those ostensibly covered by the Leases. For example, Debtor purchased at least 42 cows from Kuennen in the fall of 2012 that arrived on his farm with the Sunshine brand although Debtor personally paid for these cows and they were not part of any of the Leases.

Dairy cattle husbandry requires periodic culling, approximately 30 percent of the herd per year, and sale or retirement of livestock to keep milk production high and consistent. Throughout his lending relationship with CFB, Purdy culled and sold the entire herd and replenished his operation with purchased cattle. In July 2012, Debtor's herd reached about 750 head. The volume of Debtor's replacements for culled cattle exceeded the number of head covered by the Leases.

All replacement cattle were purchased with proceeds from sales of culled cows and calves and all from funds on deposit at CFB. Debtor testified that Blevins was aware of this and never objected to the practice despite the fact that this practice deviated from Debtor's contractual obligation with Sunshine. CFB also made regular inspections of Debtor's herd, the last occurring on August 14, 2012. At that time, Debtor had a total of 961 cows on the farm. 320 of the cows had Sunshine brands and tags. It is undisputed that landlord Martin Martinez had some cattle on the premises but they were removed by the time of trial. See, JT Ex. 19.

All five Sunshine Leases are identical except for the date of entry and number of cattle involved. Only Leases 3, 4 and 5 are still in operation as of the date of the petition. The Leases do not permit Debtor to terminate the Lease at will and return the cattle to Blevins/Sunshine. While the Leases include a 50 month lease term, the useful life of a dairy cow is less than 50 months. The Leases placed the risk of loss of cattle on Debtor. The Leases evidence the industry practice of culling and replacement of nonproductive cows, whether due to low production or poor health. Blevins/Sunshine did not tender any indicia of ownership of any of the cows delivered to Debtor's farm either from the inception of his business relationship with Debtor or during the course of the Leases.

In February or March of 2011, Debtor told CFB representative, Karissa Peterson, that he was leasing cattle from Sunshine. Karissa spoke with Blevins and informed him that CFB had an existing lien on Debtor's cattle, proceeds and farm products. On March 15, 2011, Blevins sent Peterson a letter acknowledging that CFB had a security position on all cattle owned by Debtor and that CFB had filed a UCC Financing Statement to perfect that interest. Blevins also stated in the letter that Sunshine had 240 cattle under lease to Purdy and that Sunshine owned the cattle and had filed a "UCC Financing Statement to perfect its security in its leased cattle." See, JT Ex. 47.

In the fall of 2012, Debtor began culling more of his herd than usual because the price of feed and milk prices made production of milk unprofitable. It became more economical to sell the cattle. He sold about 250 head, the majority of which were branded with the Sunshine brand.

The pre-petition bank records of the Debtor establish that Debtor made a number of deposits into his CFB bank account in the year prior to filing his bankruptcy Petition. Most of these deposits from Debtor represented sale proceeds of cows culled from the herd, calves sold from the herd and

proceeds of milk sales from the herd. Debtor paid the lessor of his farm, Martin Martinez, and Sunshine by milk assignment, which meant the Debtor did not handle those payments and actual transfers of funds originated from the end purchaser of the Debtor's milk. According to the Debtor's accounting records, Debtor received $2,883,622 net in milk income (net of land lease payments and Sunshine payments) for the calendar year 2011, all of which was deposited into the CFB bank account. Milk revenue received by Debtor for 2012 (January through November) totaled $2,167,000.64 after the assignments.

On November 29, 2012, Debtor filed his Voluntary Petition seeking relief under Chapter 12 of the United States Bankruptcy Code.

On December 6, 2012, Becky Moore and another CFB representative, Debtor, Debtor's attorney, Jeff Blevins, Mike Hatcher and Frankie Shelton, an employee of Debtor, inspected Debtor's herd. At that inspection, CFB's representatives determined there were 289 cows with CFB white ear tags and the Sunshine brand of SSH, 99 cows with white ear tags and no brand, and one cow that had no brand or ear tag for a total of 389 cows. Prior to the date of the inspection, Mike Hatcher had picked up 43 cows from the farm in violation of the automatic stay, which he later returned to Debtor's farm. Blevins claims that on the date of the inspection he had 435 head of cattle under lease to Purdy. Sunshine claims ownership of all cows with the Sunshine brand.

## II. LEGAL ANALYSIS

In order for the Court to resolve the pending motions, the Court must decide two distinct issues. The first is whether the Leases were actual leases or disguised financing transactions. The second issue is whether the milk produced post-petition and the proceeds of that milk are subject to

11 U.S.C. §552(b).  The Court will address each issue separately based upon the above Findings of Fact.

    A.  <u>Lease v. Secured Transaction</u>.

The Debtor and Sunshine executed five Dairy Cow Leases, with three still in issue.  Each Lease has essentially the same terms and has a duration of 50 months.  The Debtor was required to make a monthly payment to Sunshine.  Debtor maintained the cows, bore the risk of loss and was required to replace any sick or non-productive cows.  The Leases provide that all right and title of the cows remained in Sunshine during the term of the Leases and that it included all offspring born to leased cows under the term of the Leases.  If any cow needed replacing during the Lease term due to death or injury or for any reason, Debtor was to immediately replace the cow at his expense and the cow became the property of Sunshine.  Upon expiration of the agreement, the Debtor was to return the cows to a place designated by Sunshine.  The Leases further provided for a guaranty residual value from the sale of the cows at the end of the Lease at $200 to $300 per head, respectively.

The Leases include a choice of law provision indicating that they shall be construed under the laws of the State of Arizona.  Determining whether an agreement is a true lease or a disguised security agreement is governed by state law.  <u>Butner v. United States</u>, 440 U.S. 48, 54 (1979).  The applicable Arizona statute is AZ 47-1203.  It is identical to Kentucky's statute KRS 355.1-203, which will be referred to for ease of reference.

Whether a transaction creates a lease or security interest is determined first and foremost by the facts of the case.  Under the statute, a transaction creates a security interest if the consideration

that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee; and:

1. The original term of the lease is equal to or greater than the economic life of the goods;

2. The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

3. The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

4. The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

. . . . .

KRS 355.1-203(2). The burden of demonstrating that an agreement is other than what it purports to be is on the party asking the Court to characterize the agreement as such. In re Consolidated Energy, Inc., ____ B.R. ____, 2007 WL 3046471 (Bankr. E.D. Ky. 2007). Here, Debtor contends the Leases were a disguised financing agreement and thus the burden of proof was on Debtor.

Resolution of whether the document at issue is a lease or a secured transaction "focuses on the economics of the transaction, not the intent of the parties." D. Leibson and R. Nowka, The Uniform Commercial Code of Kentucky. §9.01[2][e][I] (3d ed. 2004). A review of the Leases shows that the Debtor did not have the option to terminate and had the right to use the cows for the term of the Lease. The next inquiry is then whether one of the four conditions cited above also exists. If the lease is not terminable by the lessee and one or more of the enumerated conditions is present, the document is a *per se* security agreement and the court's analysis ends. In re Phoenix Equipment Co., Inc., 2009 WL 3188684 (Bankr. D. Ariz. 2009).

Here it is clear that the Leases are not terminable by the Debtor. The first of the four conditions is also met. The original term of the Lease was for 50 months. Clearly, 50 months is longer than the economic life of the goods. Uncontradicted testimony indicated that a dairy herd is culled annually at an approximate rate of 30 percent. Within three years an entire herd is extremely likely to have been entirely replaced and certainly before the end of 50 months. Because Debtor met this term of the statute, the transaction is a *per se* security agreement and the Court's analysis ends here. Sunshine did not effectively rebut this evidence.

The statute, however, also clearly states that whether a transaction creates a lease or security interest is also determined by the facts of the case. Debtor's cattle herd, valued at approximately $1,500 per animal, is a very significant asset for which Sunshine never produced any credible evidence of its ownership of the herd or any part. Each transaction Sunshine suggests involved the lease of its property involves credible contradictory evidence of ownership. Clearly, in each instance, Debtor had superior evidence of his ownership of the cattle delivered to his farm. This arrangement simply does not have the economic or practical foot print of a lease transaction.

Further, the evidence presented to the Court clearly establishes that regardless of any interpretation of the Lease terms, the parties did not strictly adhere to the terms of the written agreement. The evidence established that the Leases required the Lessee to replace any cows due to death, injury or any other reason at the Debtor's sole expense and that the replacement then became the property of Sunshine. In practice, however, this term was not strictly followed. Debtor regularly sold culled cows and retained the proceeds from those sales in his CFB bank account. Debtor repeatedly paid for replacements by giving money to intermediaries who found the cows and purchased them with Debtor's funds. At some future time Sunshine forwarded the funds for the

purchase to the intermediary who then reimbursed the Debtor. However, by that time, the cows were on Debtor's farm and he was milking and caring for them. The Leases also required the Debtor to return all cows to Sunshine at the expiration of the agreement. In practice, however, Jeff Blevins testified that he often let dairy farmers purchase the cattle at the end of the agreement. The Leases also require that all cattle be delivered to the Lessee's farms with ear tags and the Sunshine brand. In practice, however, cows purchased by Branstetter were not branded until they were on Debtor's farm and were branded by Debtor's employees.

The Leases also state that Sunshine retained all right, title and interest in the cows including all offspring born to leased cows during the term of the agreement. On the first Lease executed between the parties, Debtor scratched out this reference to the Lessor retaining ownership of any offspring. Debtor regularly sold the offspring and retained the funds in his CFB account without objection by Sunshine.

The Court finds these facts distinguish this case from the Oregon State Court decision, which is not binding on this Court, submitted by Sunshine in its Post Hearing Brief. The Court finds the case at bar more in line with the facts of In re Buehne Farms, Inc., 321 B.R. 239 (Bankr. S.D. Ill. 2005), where the court determined that a very similar agreement to the Lease was in fact a disguised financing transaction. The court there relied heavily on the fact that the lessor "did not own the cows when they agreed to "lease" them to the debtor." As in this case, "instead, the cows were supplied by a third party, suggesting that movants were simply financing a sale", Buehne, 321 B.R. at 247, citing Orix Credit Alliance, Inc. v. Pappas, 946 F.2d 1258, 1263 (7th Cir. 1991). Here, Sunshine was unable to tender any evidence of title for the dairy cattle that were placed on Debtor's property, nor did it have any other indicia of ownership at the time they were provided to Debtor.

-11-

In some instances, the money for the purchase of the cows was supplied by the Debtor. The cows were on Debtor's property and he was milking and caring for them before Sunshine ever provided funds for the cows. This situation is very similar to a "floor plan," a secured financing transaction where a lender advances funds to a debtor in return for a lien on revolving inventory.

Pursuant to the KRS 355.1-203(2) the Debtor could not terminate the Leases at will and the useful life of the original goods expired well before the 50 months term of the Leases. This required the Debtor to cull unproductive cows, buy younger cows and payoff Sunshine for the culled cows, only for Sunshine to buy new cows to place on the Debtor's premises. While construction of the document as a security agreement versus a lease is determined by the facts as they exist at the time the agreements were executed, every feature of the placement of Sunshine's cows with Debtor, along with subsequent performance by the parties, indicates that Sunshine was actually providing Debtor with working capital for the dairy farm operation. This included repayment to the Debtor for advanced purchases of cattle that Sunshine claimed as its property. Sunshine's version of the nature of the Leases is belied not only by the terms of the Leases at inception, but the manner in which Sunshine placed the cattle on Debtor's premises. The Debtor met his burden of proving that this was a secured transaction and not a lease. Sunshine failed to rebut this testimony. For these reasons, the Court finds that the Dairy Cow Leases referenced in this case were disguised secured transactions.

B. <u>Superior Security Interest in Cattle on Debtor's Farm on the Date the Petition was Filed</u>.

The Court must determine who had the superior lien on the 389 cows on the date of the December 6, 2012 inspection. CFB claimed it had a superior perfected lien on all cattle on Purdy's property. CFB had a Security Agreement dated July 3, 2009 which granted it a security interest in:

> Purchase Money Security Interest in all Chattel Paper, Accounts, Equipment, <u>Farm Products, Livestock</u> (including all increase and supplies) . . . currently owned hereafter acquired. . . .
>
> . . . . .
>
> The Collateral includes any and all of the Grantors present and future Farm Products, Livestock . . . including without limitation all replacements and substitutions therefore and additions thereto, and further including without limitation any and all offspring, unborn livestock and other products previously, contemporaneously and/or in the future acquired by Grantor . . .

CFB filed a UCC-1 Financing Statement perfecting its interest in the collateral with the Kentucky Secretary of State on July 6, 2009.

CFB and Debtor executed an additional Security Agreement on August 19, 2010 which encompassed "all crops, farm products and livestock currently owned or hereinafter acquired." This Security Agreement was perfected by CFB when it filed its UCC-1 Financing Statement on September 1, 2010.

The CFB lien was perfected before the first UCC-1 Financing Statement filed by Sunshine on December 28, 2010. Sunshine filed UCC-1 Financing Statements in connection with each of its Leases. The filing states that the transaction is a "true lease" and that the UCC-1 is filed for "informational purposes only" in the event a court should subsequently "determine this is not a true lease." Of course, had Sunshine been confident that its Leases were in fact true leases, there would have been no need for filing the UCC-1 Financing Statements. In any event, the UCC-1 Financing Statements of Sunshine were subsequent to and inferior to CFB's prior recorded interest. Thus, CFB's security interest has priority over Sunshine and the cattle on Debtor's property at the time that the Petition was filed are subject to CFB's lien.

C. <u>Lien Superiority in Post-Petition Milk Proceeds</u>.

CFB and Sunshine also dispute ownership in all milk proceeds earned by the Debtor after the date the Petition was filed. CFB contends that its security interest in "farm products" applies to post-petition milk proceeds. Sunshine, however, contends that if CFB has a security interest, any pre-petition security interest does not encumber milk proceeds earned after the date the Petition was filed based on 11 U.S.C. §552(b).

Under 11 U.S.C. §552(a), property acquired by the debtor post-petition is not subject to any lien resulting from a pre-petition security agreement. Subsection 552(b), provides an exception to this rule,

> . . . if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring or profits of such property, then such security interest extends to such proceeds, products, offspring or profits acquired by the estate after the commencement of the case to the extend provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

There are different lines of authority regarding the effect of 11 U.S.C. §552(b) with respect to livestock, offspring of livestock and milk proceeds. Sunshine advocates for the line of cases that hold post-petition milk does not fit within the §552(b) exception, citing <u>In re Lawrence</u>, 41 B.R. 36, 37-38 (Bankr. D. Minn. 1984), <u>aff'd</u>., 56 B.R. 727 (D. Minn. 1984). In <u>Lawrence</u>, the Court determined that post-petition milk is not subject to the §552(b) exception because the milk is an asset that comes into existence after the filing of the Petition. Otherwise, the Court reasoned that the exception in Subsection (b) would swallow the rule of Subsection (a). The Court's decision was based on its belief that Subsection (b) is a very limited exception intended to cover the situation

-14-

where a creditor holds a security interest in raw materials and after the filing of a bankruptcy petition, the debtor changes their form by converting them into inventory. Under such a scenario, §552(b) would protect the creditor's interest in the finished product.

The other line of cases relied upon by CFB finds that a creditor's lien in farm products extends to milk produced post-petition and to the proceeds from its sales. In re Wiegmann, 95 B.R. 90 (Bankr. S.D. Ill. 1989). Wiegmann follows earlier decisions that held that milk produced post-petition is a product of secured pre-petition livestock within the meaning of §552(b). See, In re Underbakke, 60 B.R. 705, 708 (Bankr. N.D. Iowa 1986); Smith v. Dairymen, Inc., 790 F.2d 1107 (4th Cir. 1986); In re Rankin, 49 B.R. 565 (Bankr. W.D. Mo. 1985); and In re Potter, 46 B.R. 536 (Bankr. E.D. Tenn. 1985). These decisions look to the security agreement and applicable non-bankruptcy state law. The Courts set forth the following test in applying Section 552(b): (1) there must be a pre-petition security agreement; (2) the security agreement extends to pre-petition property and proceeds; products, offspring, etc. of such property; and (3) applicable non-bankruptcy state law permits the security agreement to extend to such after acquired property.

This Court finds the Wiegmann analysis to be most in line with the plain terms of 11 U.S.C. §552. All of the factors of the test referenced above apply in this case. CFB's security interest clearly covered all crops, farm products and livestock currently owned or hereafter acquired.[1] As the above referenced cases demonstrate, a creditor's pre-petition lien in farm products extends to

---

[1] KRS 355.9-102(1)(ah), defines "Farm Products" as "Products of crops or livestock in their unmanufactured states." The official comments to the UCC, provide that processes so closely connected with farming "such as pasteurizing milk" would not constitute manufacturing.

milk produced post-petition. Kentucky law also permits security agreements to extend to such after acquired property. KRS 355.9-204.

Sunshine in its post-hearing briefs states that CFB's claim to post-petition milk proceeds is limited to the "milk produced by the cows subject to its security interest and not from cows subject to the Sunshine Heifers leases." Because the Court determined that the Dairy Cow Leases are in fact security agreements and that the cows referenced in those agreements are in fact covered by CFB's prior UCC-1 filings, Sunshine's only interest arises after CFB's claim is satisfied. Accordingly, Sunshine's Motions to Extend Time to Assume or Reject Unexpired Leases and for Relief from the Stay on Livestock must be **DENIED**.

## CONCLUSION

For all of the above reasons, the Court determines that the Dairy Cow Leases are security interests, not true leases; that CFB's prior perfected liens attach to all cows on Debtor's farm on the date the Petition was filed and to all milk produced post-petition and its proceeds pursuant to 11 U.S.C. §552(b). The Court **DENIES** the Motion of Sunshine Heifers, LLC to Extend Time to Assume or Reject Unexpired Leases and Sunshine's Motion for Relief from Stay on Livestock. An Order incorporating the findings herein accompanies this Memorandum-Opinion.

                                                              Joan A. Lloyd
                                                              United States Bankruptcy Judge
                                                                  Dated: March 1, 2013

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

IN RE:                              )
                                    )
    LEE H. PURDY                    )    CASE NO. 12-11592
                                    )
            Debtor(s)               )

### ORDER

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Dairy Cow Leases of Sunshine Heifers, LLC are security interests, not true leases. Therefore, the prior perfected liens of Citizens First Bank attach to all cows on Debtor's farm on the date the Petition was filed and to all milk produced post-petition and its proceeds pursuant to 11 U.S.C. §552(b).

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Motions of Sunshine Heifers, LLC to Extend Time to Assume or Reject Unexpired Leases and Motion for Relief from Stay on Livestock, be and hereby are, **DENIED.** The Motions of Citizens First Bank to Prohibit Use of Cash Collateral and for Relief from the Automatic Stay on Livestock and Farm Equipment will be scheduled for hearing by separate Order.

_____
Joan A. Lloyd
United States Bankruptcy Judge
Dated: March 1, 2013