**UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**WESTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LEE H. PURDY | ) | CASE NO.  12-11592(1)(12) |
| | ) | |
| Debtor(s) | ) | |

**MEMORANDUM-OPINION**

This matter is before the Court following entry of an Opinion of the Sixth Circuit Court of Appeals dated August 14, 2014, reversing this Court's Memorandum-Opinion dated March 1, 2013 and remanding the matter to this Court for further proceedings consistent with the Sixth Circuit's Opinion.

In this Court's March 1, 2013 Memorandum-Opinion, the Court held that documents signed by Debtor Lee Purdy ("Debtor" or "Purdy") and creditor Sunshine Heifers, LLC ("Sunshine") entitled "Dairy Cow Leases," were disguised secured transactions, rather than true leases.  This finding was affirmed by the United States District Court for the Western District of Kentucky.  On appeal, the Sixth Circuit reversed this Court's finding and determined that secured creditor Citizens First Bank ("CFB") failed to demonstrate that the Dairy Cow Leases were disguised security agreements and remanded the matter for further proceedings consistent with this Opinion.

On remand, this Court was charged with determining the rights of CFB, Debtor's primary secured creditor, and Sunshine under the Dairy Cow Leases and ownership of proceeds of a post-petition auction of 415 head of cattle constituting Debtor's dairy operation.  The following constitutes the Court's Findings of Fact and Conclusions of Law on remand.

## PROCEDURAL BACKGROUND

On November 29, 2012, Debtor filed his Voluntary Petition seeking relief under Chapter 12 of the United States Bankruptcy Code (Docket No. 1 in main case file, hereinafter referred to as "Dkt. No. ___").

On December 3, 2012, Robert W. Keats was appointed as the Chapter 12 Trustee.

On December 11, 2012, CFB filed its Motion to Prohibit Use of Cash Collateral asserting its security interest in all farm products, livestock, as well as "all products of its collateral," referring to milk produced from livestock under lien to CFB.  (Dkt. No. 18).

On December 11, 2012, CFB also filed a Motion for Stay Relief regarding livestock and farm equipment.  (Dkt. No. 20).

On December 12, 2012, Sunshine filed a Motion to Prohibit Use of Cash Collateral claiming it was a secured creditor of Debtor pursuant to three Dairy Cow Leases under which it claimed a security interest in all milk and the proceeds produced and pursuant to specific milk lease assignments.  (Dkt. No. 25).

On December 12, 2012, Sunshine also filed a Motion to Shorten Time for Debtor to Assume or Reject Unexpired Leases and a Motion for Relief from Stay regarding cattle under the Dairy Cow Leases.  (Dkt. No. 27).

On December 13, 2012, Debtor filed his Schedules to his Voluntary Petition.  On Schedule B, Personal Property, Debtor listed 428 head of cattle with a current value of $523,750.  On Schedule D, Creditors Holding Secured Claims, Debtor identified CFB with a secured claim of $454,954 on 428 head of cattle.  On Schedule F, Creditors Holding Unsecured Nonpriority Claims,

Debtor listed "Sunshine Holstein's c/o Jeff Blevins" with a claim in an unknown amount. (Dkt. No. 36).

On January 22, 2013, this Court held an evidentiary hearing on CFB's Motion to Prohibit Use of Cash Collateral, CFB's Motion for Relief from Stay, Sunshine's Motion to Shorten Time to Assume or Reject Unexpired Leases and Sunshine's Motion for Stay Relief. The Court took the matters under submission at the conclusion of the hearing.

On February 20, 2013, Sunshine filed a Motion for Removal of Debtor as Debtor-in-Possession. (Dkt. No. 139).

On March 1, 2013, this Court entered its Memorandum-Opinion finding that Sunshine's Dairy Cow Leases were actually disguised financing transactions and not true leases. The Court also found that CFB held a prior perfected lien that attached to all cattle on Debtor's farm on the date the Petition was filed and on all milk proceeds produced post-petition pursuant to 11 U.S.C. §552(b). The Court also denied Sunshine's Motion to Shorten Time to Assume or Reject Unexpired Leases and Sunshine's Motion for Stay Relief. The Court also set CFB's Motion to Prohibit Use of Cash Collateral and Motion for Stay Relief for hearing. (Dkt. No. 150).

On March 13, 2013, Sunshine filed its Notice of Appeal of the Memorandum-Opinion of March 1, 2013. (Dkt. No. 157).

On March 15, 2013, Sunshine filed Adversary Proceeding No. 13-01013 against Debtor seeking a judgment of nondischargeability under 11 U.S.C. §523(a)(2), (4) and (6). (Dkt. No. 163).

On March 19, 2013, Sunshine filed an Emergency Motion for Stay Pending Appeal. (Dkt. No. 172).

-3-

On March 21, 2013, this Court entered an Order granting CFB's Motion for Stay Relief and an Order granting CFB's Motion to Prohibit Cash Collateral of CFB specifically referencing the proceeds of the sale of milk as a farm product and subject to CFB's lien. (Dkt. Nos. 177, 178).

Also on March 21, 2013, the Court entered an Order granting Sunshine's Motion to Remove the Debtor as Debtor-in-Possession and ordered the Trustee to assume all duties as specified in 11 U.S.C. §§704(a)(8), 1106(a)(1), (2), (6), (7) and 1203. (Dkt. No. 179).

On March 21, 2013 following an expedited hearing, the Court granted Sunshine's Motion for a Stay Pending Appeal on the condition that Sunshine post a full cash bond of $100,000 no later than 4:30 p.m. on March 22, 2013. (Dkt. No. 180).

On March 22, 2013, CFB filed a Motion for Clarification Regarding Stay Pending Appeal. The Court heard the Motion on an expedited basis later the same day and clarified that if Sunshine posted the bond, it did not have authority to assume possession and control of the cattle on Debtor's farm, that Sunshine did not have stay relief and that the Trustee had authority over possession and control of the cattle. (Dkt. Nos. 184, 190).

Later on March 22, 2013, Sunshine filed a Motion for Stay Relief Regarding Livestock. Sunshine, however, did not post the $100,000 cash bond by 4:30 p.m. on March 22, 2013. (Dkt. No. 187).

On March 25, 2013, an Order granting Sunshine's Motion for Stay Relief was entered. (Dkt. No. 189).

On March 27, 2013, the Trustee filed a Motion to Sell the Cattle of the Debtor's Estate. (Dkt. No. 192).

-4-

On March 28, 2013, CFB filed a Joinder to Trustee's Motion for Authority to Sell Cattle pursuant to 11 U.S.C. §363, seeking an order to sell all cattle owned by Debtor free and clear of all liens.  CFB had been caring for the cattle at the request of the Trustee since March 21, 2013.  (Dkt. No. 197).

On March 29, 2013, Sunshine filed its Response to the Sale Motion of the Trustee objecting to the nature of the sale proposed by the Trustee contending that the value to the estate would be maximized by placing the cattle in the hands of a third party to improve the dairy milk production of the dairy cow herd.  (Dkt. No. 200).

On March 29, 2013, after a hearing, the Court entered an Order granting the Trustee's Motion to Sell Dairy Cattle.  The Order provided that all funds expended by CFB for the care of the dairy cattle be accounted for and preserved as an administrative expense of the estate.  No appeal of this Order was taken by Sunshine.  (Dkt. No. 204).

On April 14, 2013, the Trustee filed his Report of Sale following an auction of the dairy cattle held on April 13, 2013.  The Report indicated that 415 cows were sold.  Gross sales proceeds totaled $425,001.20, costs associated with the sale totaled $22,647, leaving net sale proceeds of $402,354.54.  (Dkt. No. 219).

On April 22, 2013, CFB filed a Motion Seeking an Order Requiring Lonestar Milk to Turnover Milk Proceeds Checks to it on the basis of the Court's Memorandum-Opinion holding that CFB held the first lien on all milk proceeds and the Court's Orders terminating the stay on behalf of CFB and terminating Debtor's rights to use its cash collateral.  (Dkt. No. 235).

On April 29, 2013, Sunshine filed an Objection to CFB's Motion for Lonestar Milk to Turnover Milk Proceeds Checks contending it had a valid secured claim to the proceeds and that the issue was currently on appeal. (Dkt. No. 243).

Following a hearing on CFB's Motion for Turnover of Milk Proceeds, the Court entered an Order on May 20, 2013 requiring Lonestar to turnover any checks for milk proceeds from the Debtor's estate to the escrow account of the Trustee pending further Order of the Court. (Dkt. No. 258).

On July 1, 2013, CFB filed a Motion to Abandon Funds Constituting Net Proceeds and Sale of Cattle held by the Trustee based on its status as the first lien holder on said proceeds. (Dkt. No. 274).

On August 15, 2013, Sunshine filed its Response and Objection to CFB's Motion to Abandon Funds held from Milk and Cattle Proceeds. (Dkt. No. 311).

On August 20, 2013, CFB filed its Response to Sunshine's Objection to the Motion to Abandon and Objecting to the Trustee and CPC's Commodity's Request to Surcharge the Collateral $15,356.01 for feed provided to the cattle by CPC, contending administrative claimants cannot surcharge a secured creditor's collateral. (Dkt. No. 316).

On September 13, 2013, after a hearing, this Court issued its Order granting CFB's Motion to Abandon requiring the Trustee to turnover the proceeds from the sale of Debtor's milk and cattle to CFB. (Dkt. No. 329).

On September 25, 2013, the United States District Court for the Western District of Kentucky issued its Order affirming this Court's Memorandum-Opinion dated March 1, 2015. (Dkt. No. 336).

On October 30, 2013, Sunshine filed its Notice of Appeal to the Sixth Circuit Court of Appeals.  (Dkt. No. 355).

On August 14, 2014, the Sixth Circuit issued its Opinion reversing and remanding the matter to this Court.  (Dkt. No. 362).

On December 2, 2014, this Court issued an Order to the parties to submit briefs regarding pending matters before the Court on remand.  (Dkt. No. 385).

On February 25, 2015, this Court issued its Memorandum-Opinion and Order indicating the need for an evidentiary hearing regarding ownership of the cattle on the Debtor's dairy farm at the time of the auction and whether any of the cattle sold were owned by the Debtor, if so, how many and whether any of the cattle were under lease from Sunshine and if so, how many.  (Dkt. No. 390). The Court scheduled an evidentiary hearing for July 14, 2015 regarding ownership of the cattle that were auctioned by the Trustee.  The parties conducted additional discovery and prior to the hearing, filed the following motions which were scheduled by the Court to be heard on the date of the evidentiary hearing:

1.    Motion of CFB for the Court to Enter an Order that Doc. Nos. 177, 178, 204, 329 and 354 are Final and Non-appealable and that the Court's Review is Limited to Doc. No. 150.  (Dkt. No. 394).

2.    Motion of CFB for the Court to Enter an Order that if Sunshine can make Arguments as to the Proceeds, Sunshine is Barred from Raising Any Arguments as to Costs and Fees as Established by the Law of the Case.  (Dkt. No. 395).

3.    Motion of CFB for the Court to Enter an Order Finding that Sunshine Bears the Burden of Proof on Remand.  (Dkt. No. 396).

4.    Motion of Sunshine for the Court to Enter an Order that Establishes the Court's Procedural Authority for Granting Sunshine's Request for a Money Judgment.  (Dkt. No. 413).

On July 14, 2015, this Court heard arguments of counsel on the pending Motions. The Court then heard testimony from witnesses Kendall Branstetter, Martin Martinez, Jeffery Blevins, Danny Layton, Bill Chase, and Becky Moore before taking all matters under submission.

## PRETRIAL MOTIONS

CFB filed a Motion for the Court to order that Dkt. Nos. 177, 178, 204, 329 and 354 of the Court's file are final and non-appealable and that the Court's review on remand is limited to the Memorandum-Opinion entered on March 1, 2013. (Dkt. No. 394). Docket Nos. 177 and 178 are this Court's Orders entered on March 21, 2013 granting CFB's Motion for Stay Relief Regarding Livestock and Farm Equipment and the Order granting CFB's Motion to Prohibit Debtor's Use of Cash Collateral on the Proceeds of the Sale of the Milk in Debtor's Dairy Operation. Docket No. 204 is the Order granting the Trustee's Motion to Sell Dairy Cattle. Docket No. 329 is the Order granting CFB's Motion Directing the Trustee to Turnover Funds from the Sale to CFB and Docket No. 354 is the Order granting the Trustee's Motion for Fees. Sunshine did not file an appeal on any of these Orders.

Sunshine objects to CFB's Motion on the grounds that although these Orders were not appealed, this Court has the authority based upon the Sixth Circuit's Order reversing and remanding for matters consistent with its Opinion, to "address all matters regarding or affected by the Sixth Circuit Opinion, which would include the sale of cattle and allocation of the proceeds from the auction." In this Circuit, the rule is that a remand by an appellate court may be limited or general. *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999). A limited remand must "explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate. . .. General remands, in contrast, give district courts authority to

address all matters as long as remaining consistent with the remand." *Id.* at 265, citing *United States v. Moore*, 131 F.3d 595, 597 (6ᵗʰ Cir. 1997).

In this case, the Sixth Circuit determined that CFB failed to prove that the Dairy Cow Leases were actually disguised security agreements and therefore reversed this Court's ruling that the Dairy Cow Leases were *per se* security agreements and remanded the case to this Court for further proceedings consistent with this Opinion. The Court deems this to be a general remand. However, for purposes of this Opinion, the Court finds it unnecessary and impossible to unwind any of the Orders and transactions given that all of the property in question was livestock or milk produced therefrom and all livestock was sold at auction in 2013. The Trustee's fee award was also not appealed and the Court will not reconsider this Order, Dkt. No. 354. Furthermore, there was no appeal or challenge to the expenses incurred by CFB in assisting the Trustee with the care of the cattle. Therefore, the Court will not reconsider these issues in light of the findings herein.

All that remains is the Court's decision represented in Docket No. 329 which granted CFB's Motion Directing the Trustee to Turnover Funds from the Sale to CFB. Since this Order relates to the allocation of the proceeds from the auction, it is covered by the appellate court's order on remand. Therefore, the Court will **GRANT IN PART AND DENY IN PART** CFB's Motion to Find These Orders Final and Non-appealable.

The next pretrial motion is CFB's dispositive motion for the Court to enter an order stating that if Sunshine can make arguments as to the auction proceeds, Sunshine is barred from raising any arguments on the costs and fees as established by the law of the case. (DKt. No. 395). On remand, to the extent the proof at the evidentiary hearing established Sunshine's ownership in any of the auctioned cattle, the Court would have to consider allocating the proceeds of the auction consistent

-9-

with that finding. However, the Orders relating to removal of the Debtor-in-possession, the Trustee's authority over the cattle, and the Order giving the Trustee the authority to care for the cattle and sell the cattle, were not appealed and are final. The Trustee requested CFB to help care for the cattle during the short time period he needed to arrange the auction. Fees, costs and expenses associated with the sale of the cattle were incurred at that time and were in the best interest of the estate and its creditors. Although Sunshine wanted control of the cattle, at that time, there were no legal grounds upon which this Court could grant that request. More importantly, Sunshine failed to post the required bond that would have stayed enforcement of the Court's Opinion. The Court will not unwind those transactions or reconsider any of the fees, costs and expenses associated with the sale of the cattle since they were not appealed, not stayed and are final Orders.

Importantly, Sunshine did not appeal the Order terminating the automatic stay in favor of CFB or the Order granting Trustee's Motion to Sell the Cattle. Instead, Sunshine chose to appeal this Court's legal finding regarding its characterization of the Dairy Cow Leases. No other issues were considered by the appellate court. Again, considering the findings by this Court on remand, there is no reason to reconsider these issues. The Court will **GRANT** CFB's Motion, but only to the extent it applies to the amount of proceeds of the auction, the costs, fees and expenses of the auction.

The next Motion is CFB's Motion for the Court to Enter an Order Finding that Sunshine Bears the Burden of Proof on Remand. (Dkt. No. 396). The Court determines that since both CFB and Sunshine are making affirmative claims to the proceeds of the cattle, both parties bear the burden of proof on their claims. "The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim." *Auburndale State Bank v. Dairy*

-10-

*Farm Leasing Corp.*, 890 F.2d 888, 893 (7th Cir. 1989). Both parties were given the opportunity to conduct discovery and present evidence in support of their claims much like an ordinary adversary proceeding where claims are set forth in a complaint and the opposing party raises claims by way of counterclaim. As in the *Auburndale* case, ". . . the rule should be that all parties asserting ownership should take measures to prove the identity of their own [cows]." *Id.* Therefore, the Court will **DENY** CFB's Motion.

Finally, Sunshine filed a Motion for the Court to enter an Order that establishes the Court's procedural authority for granting Sunshine's request for a money judgment. (Dkt. No. 413). CFB contends that Sunshine could not pursue the relief it requested on remand because it had not filed an adversary proceeding. Normally, an adversary proceeding would be required pursuant to Bankr. R. Civ. P. 7001, since the relief requested pertains to the recovery of money and involves the validity, priority or extent of a lien. This very issue was raised and addressed by the district court on appeal. Judge McKinley cited case law on point providing, "where a party has proceeded by a motion and the record has been adequately developed . . . courts have reached the merits of the dispute despite the procedural irregularity." *In re Branif Intern. Airlines, Inc.*, 164 B.R. 820, 831 (Bankr. E.D. N.Y. 1994). This Court agrees with this authority and Judge McKinley, that in such circumstances, form should give way to substance. Here, both parties engaged in extensive discovery, both parties developed an extensive record before this Court, and fully participated in all hearings. Both parties had adequate opportunities to be heard. Therefore, the Court believes the procedural irregularities of proceeding without an adversary proceeding have been cured and no party has been prejudiced by the manner in which the issues have been presented to the Court. Accordingly, the Court will **GRANT** Sunshine's Motion.

-11-

A separate Order incorporating the rulings herein on the Pretrial Motions accompanies this
Memorandum-Opinion.

## <u>FINDINGS OF FACT</u>

The facts of this case were set forth by the Court in its March 1, 2013 Opinion.  The Sixth
Circuit's Opinion reversing this Court's Order did not base its reversal on this Court's factual
findings.  Rather, the appellate court focused on the terms of the "Dairy Cow Lease," *i.e.*, the terms
of the contract which explicitly stated that Sunshine retained a reversionary interest in the herd,
focusing on the provisions of the lease which required the Debtor to maintain the integrity of the
lease numbers and the option to purchase the cattle at the end of the lease for something other than
a nominal price.

The issue before the Court now is whether the 415 head of cattle sold at the auction by the
Trustee were cattle subject to the Dairy Cow Leases or whether the cattle were owned outright by
the Debtor and subject to CFB's security interest.  The Sixth Circuit in its Opinion stated, "Finally,
whether the parties adhered to the terms of these leases in all facets, in our view, is irrelevant to
determining whether the agreements were true leases or disguised security agreements."  Opinion,
p. 10.  Whether the parties followed the terms of the leases, however, is critically important to this
Court's analysis of ownership of the cows auctioned by the Trustee in April 2013.

Important to this analysis is the Debtor's testimony as to how his dairy operation worked.
Debtor had one bank account that was held with his secured creditor, CFB.  There is no dispute that
all proceeds from the milking operation went into this account.  Additionally, all funds Debtor
received from selling calves, as well as all cattle "culled" from the operation, for whatever reason,
*i.e.* sickness, age, lack of productivity, regardless as to whether they were subject to Sunshine's

leases, went into this same account.  Also, some of the cattle bought as replacements for culled calves under the leases, were purchased with commingled funds out of this same account.  Thus, money that may have been derived from the sale of Sunshine's cattle under the leases was commingled with money derived from the dairy operation and subject to CFB's security interest and constituted CFB's collateral.

The Debtor operated the dairy farm on property he leased from Martin Martinez.  In 2008, he entered into a loan agreement with CFB pledging, among other things, his herd of dairy cattle as collateral.  He refinanced the loan in 2009 and executed a new note in exchange for additional principal of $417,570 and executed a new "agricultural security agreement" in which he granted CFB a purchase money security interest in "all . . . Chattel Paper, Accounts, Equipment, Farm Products, Livestock including increase and supplies . . . currently owned or hereafter acquired . . .." CFB perfected its purchase money security interest by timely filing a financing statement with the Kentucky Secretary of State.  Debtor and CFB executed two similar security agreements in August 2010 and May 2012.  These security interests were also similarly perfected by CFB.

In 2009, Debtor decided he wanted to increase the size of his herd.  He contacted Jeff Blevins of Sunshine about increasing the herd.  Blevins had some cattle leased on an operation that was in default and he told Debtor he could get 45 head from this operation to add to his dairy operation. Sixteen of the 45 head provided had to be culled from the herd as unfit for Debtor's operation. Blevins found 16 additional cows to replace these culled cows.

The cattle were delivered to Debtor's farm.  They were branded and tagged with the Sunshine brand and eartags before they were delivered to Debtor's farm.  After culling the 16 from the herd Debtor accepted the cattle and began caring for and integrating them into his dairy

-13-

operation.  However, it was not until approximately three months later on August 7, 2009 that Debtor and Sunshine entered into the first Dairy Cow Lease for cattle that had already been delivered to Debtor's farm and were part of Debtor's dairy operation.  Debtor and Sunshine entered into a General Letter of Understanding and Dairy Cow Lease.

Over the next several years, Debtor and Sunshine entered into a total of five Dairy Cow Lease Agreements.  Three of the five are relevant to the matter before the Court: (1) July 21, 2011 Agreement, involving 50 head; (2) July 14, 2012, rolling up two prior Agreements involving 285 head; (3) July 14, 2012 Agreement for 100 head.  Although the number of cattle involved and monthly rental amounts and residuals differed under the Dairy Cow Leases, the essential terms of each Lease were identical.  The Court incorporates herein verbatim the Sixth Circuit summary of the operative terms of the Dairy Cow Leases:

> Each of these agreements is titled a "Dairy Cow Lease," and under their terms, Purdy received a total of 435 cattle for fifty months in exchange for a monthly rent.  *See, e.g.*, R. 20-17 at 2 (50 Cattle Agreement) (Page ID #351).  The agreements prohibited Purdy from terminating the leases, and Purdy agreed to "return the Cows, at [his] expense, to such place as Sunshine designate[d]" at the end of the lease term.  *Id.* at 2-3 (Page ID #352).  Additionally, Purdy guaranteed "the net sales proceeds from the sale of the Cows . . . at the end of the Lease term [would] be [a set amount between \$290 and \$300] per head (the 'Guaranteed Residual Value')."  *Id.* at 11 (Page ID #360).  Purdy further promised to maintain insurance on the cattle, to replace any cows that were culled from the herd, and to allow Sunshine the right to inspect the herd.  *Id.* at 3 (Page ID #352).  When the parties signed these contracts, they also executed security agreements, and Sunshine filed financing statements with the Secretary of State.  *See, e.g.*, id. at 13-18 (Page ID #362-367).

Opinion, p. 3.

Other operative terms of the Lease Agreement delineated the duties of Sunshine and duties of the Debtor under the Lease Agreement.  Sunshine, as lessor was to provide the number of cows set forth in the lease and the lessee, Debtor, was to inspect the cows and accept the cows after

-14-

adequate time for observation and inspection.  Paragraph 15 of the Lease set forth the policy of the

Lease regarding the replacement of cows.  That paragraph provides, in pertinent part,

> . . . Lessee shall provide Sunshine immediate written notice of any loss or damage
> to any Cow.  In the event that any of the cows are injured or become ill, Lessee shall
> take all reasonable steps to treat and cure the Cows at Lessee's expense.  If any of
> the Cows need to be replaced because of death, injury or any other reason, Lessee
> shall immediately replace such Cow at Lessee's sole cost and expense with a Cow
> of like kind and value of the original Cow.  Such Cow shall be purchased in the name
> of Sunshine, branded and tagged with "SSH" identification number and shall become
> property of Sunshine and be a Cow hereunder for all purposes.  Lessee further agrees
> that all replacement animals will be purchased from the inventory of the source that
> has been approved by Sunshine.

Exhibit  B  to  the  Lease  entitled,  "IDENTIFICATION  AND  REPLACEMENT

PROCEDURES" required Lessee to notify Sunshine of and replace any cows that died or were

culled within one week.  Replacement cows were to be branded with the SSH brand and tagged with

SSH plastic eartags immediately.  It further provided, "All funds from culls must be paid directly

to Sunshine Heifers L.L.C.."  After Debtor had replaced, branded, identified the replacements and

reported to Sunshine, the cull funds would then be released to Debtor.  *See*, Exhibit B to Dairy Cow

Lease, par. 3.

Although the Lease required that no cow be disposed of without notice to Sunshine, Debtor

did not give such notice.  Although, the Lease also required that all funds received from culled cows

were to be paid to Sunshine, Debtor did not do this either.  Blevins testified that if a cow left the

herd, Sunshine wanted it replaced to keep the numbers up under the Lease.  Debtor was required to

report culls replaced and new ones branded.  In practice, however, Debtor was selling the culled

cows, as well as new calves and placing the proceeds from these sales into the CFB account.

Sunshine, through Blevins, testified that it was fully aware that these terms of the Lease were not

followed.  The terms of the Lease on replacements of the cows were material terms of the contract

as Blevins testified that he believed it critical that the integrity of the herd's numbers under the Lease be preserved. Despite this, as well as his knowledge that these terms were not being followed, Blevins did not object.

At the time that Debtor filed his Voluntary Petition, only Leases 3 through 5 were in effect. Lease 4, however, was executed to simply wrap up Leases 1 and 2. The Lease terms required Sunshine to purchase and provide the cattle to the Debtor. Debtor was required to inspect the cattle prior to acceptance. In practice, however, after the first Lease, third parties were used to purchase the cattle for the Lease. Although there is no provision in the Lease for Debtor to advance funds for these purchases, the trial testimony established that Debtor regularly advanced funds for the purchase of the cattle, funds that came from the CFB account. The funds in this account contained the proceeds of CFB's collateral. Under all of the Leases entered after the first Lease, Debtor received the cattle and became responsible for their care and feeding well before Sunshine advanced funds for the cattle or executed the Leases with Debtor.

Lease 3 was executed on July 21, 2011 and covered 50 head of cattle. The cattle were purchased from Linus Kuennan and Kendall Branstetter and were branded, tagged and delivered to Debtor's farm. Sunshine did not issue a check to Branstetter until July 22, 2011 for $19,200 and one to Kuennan until July 28, 2011 for $57,000 for the cattle. By that time, however, the cattle had been on Purdy's farm and were incorporated into his dairy operations. The overwhelming evidence showed Debtor had possession of the cattle and was caring for and milking the cattle well before Sunshine ever advanced any money for those cattle.

Kuennan also provided replacement cattle to Debtor for which Debtor paid Kuennan with personal checks drawn on the CFB account. The record showed 2 checks dated September 30, 2011,

-16-

and October 30, 2011 each in the amount of $21,333.33. There were also 4 checks dated February 28, 2011 in the amounts of $15,000 or $14,250 written by Purdy on the CFB account to Kuennan for replacement cattle. Kuennan delivered the cattle with the SSH brand and Debtor began caring for and milking the cattle once they were delivered.

Lease 4, executed on July 14, 2012, wrapped up Leases 1 and 2, which were executed in 2009 and 2010. At the annual cull rate of 30%, all of the cattle under Lease 1 would have been culled by the time of the execution of Lease 4. Under Lease 2, Purdy either purchased all cattle himself, or they were purchased by third parties and delivered to his farm where he cared for them before Sunshine advanced any funds. Kendall Branstetter testified he found 38 springing heifers that he provided to Debtor. But it was Debtor, not Sunshine, who wrote a check to Branstetter for $47,525 out of the CFB account for these cattle. These cattle were on Debtor's farm and being milked and cared for by Debtor by the time the Lease was signed. Once the Lease was signed, Sunshine wired the $47,525 directly into Debtor's CFB account at Branstetter's direction in order to reimburse Purdy for the cattle.

Additional cattle for Lease 2 were purchased from Danny Layton. As with the other cattle, under the Lease, the cattle were delivered to Debtor and being cared for by Debtor before Sunshine wired the funds to Layton for their purchase in December 2010.

Lease 5 was also entered into on July 14, 2012 and covered 100 head of cattle. Branstetter purchased cattle under this lease from various sources which were delivered to Debtor's farm during June and July of 2012. The evidence established that it was Debtor, not Sunshine, who advanced funds for the cattle out of the CFB account. Sunshine did not issue a check to Branstetter for these

-17-

cattle until the end of July.  Upon receipt of the check from Sunshine, Branstetter reimbursed Debtor for the funds he had advanced for the initial purchase of the cattle.

On cross examination at the recent hearing, Branstetter testified that he never used his own money to purchase the first group of cattle under the 100 head lease.  He had an agreement with an individual named Terry Shoemaker who purchased the cattle.  Debtor would then pay Shoemaker for the cattle.  Branstetter then invoiced Sunshine for the cattle but by that time, the cattle had been delivered to Debtor's farm and were part of Debtor's dairy operation.  Once Branstetter invoiced Sunshine and received the money from Sunshine, he paid Debtor for the cattle.  Importantly, Jeff Blevins of Sunshine testified he was unaware of Branstetter and Shoemaker's arrangement with Debtor on advancing funds for the purchase of the cattle for the Sunshine Lease.

In addition to the cattle subject to Sunshine's Lease, Branstetter sold other cattle to Purdy for use in his dairy operation but probably no more than 50 to 100 head.  Branstetter testified that as Purdy culled cows with a brand, he would brand the replacement with the Sunshine brand.  Debtor testified that cattle he received from Branstetter and Danny Layton, did not have brands but rather were branded once they got to Debtor's farm by Debtor and his employees.  Layton, however, testified that he purchased 75 head of cattle for one of the Sunshine Leases.  Layton testified that he received a brand from Jeff Blevins and he branded and tagged the cattle with eartags for SSH before they were delivered to Debtor's operation.  Sunshine then wired the funds for these cattle to Layton.

Debtor testified that at one point every cow on the farm had a brand, regardless as to whether the cow was a replacement cow under any of the SSH Leases or cows purchased by Debtor with funds out of the CFB bank account.  Debtor testified that branding is a difficult, messy process that

creates a terrible lingering odor.  He said it would take his entire crew to do the branding.  Since it took the entire crew, they would brand any cattle on the farm at one time, including some that were meant to be under the Sunshine Leases, as well as cattle Debtor purchased with money out of the CFB account that were not part of the Sunshine Leases.  Debtor acknowledged that this was a mistake by his employees.

By July and August 2012, Debtor estimated there were approximately 750 head of cattle on the farm.  At a predictable, industry cull rate of approximately 30%, he culled and replaced approximately 200 head–all bought with checks written on the CFB account.

Debtor also testified that his milking operation was becoming less profitable and between September and November, 2012 he sold approximately 250 head, most of which had the SSH brand.

Also of critical importance, during the time of all of these purchases, and while Debtor was advancing funds out of the CFB account, millions of dollars in milking proceeds were also being deposited into the CFB account, including proceeds claimed by Sunshine under its security agreement.  Thus, funds from the sale of Debtor's culled cattle and milk proceeds subject to CFB's prior perfected liens, and deposited at CFB, were consistently commingled with funds that might have been generated from Sunshine cattle and milk.  There, however, was absolutely no evidence from Sunshine that gave the Court any tool to determine how much money in the account constituted Sunshine's funds.  Significantly, despite the very large number of cattle on the Debtor's property, the high cost per cow, the millions of dollars of milk proceeds at stake, all but a very few purchases and sales of cattle and milk were made by check written on Purdy's account or deposited in it.

The record is replete with dozens, if not hundreds, of checks representing purchases and sales transactions of cattle through Purdy's CFB account.  The record evidencing Sunshine's purchase of

-19-

cattle for Debtor's operation is represented only by after-the-fact purchases by way of reimbursements to the initial party that made the purchase. The best evidence of Sunshine's ownership of cattle at the time of the filing of the Petition was their brand, which the record established was unreliable.

On November 21, 2012, Debtor filed his Voluntary Petition seeking relief under Chapter 12 of the Bankruptcy Code. Approximately one week after the filing, a representative from CFB and a representative of Sunshine inspected the cows in Debtor's operation. Of the total 389 cows, 289 had white eartags (CFB's tags), and Sunshine's brand. Ninety-nine had only white eartags and no brand and one cow had neither a tag nor a brand. Forty-two cattle which were removed by an individual after the filing, but in violation of the automatic stay, were later returned. Of this amount, 39 bore Sunshine's brand.

On April 13, 2013, the Trustee, with Court authority, sold the 415 head of cattle on Debtor's farm. The live auction was conducted by Farmers Livestock Market of Glasgow, Kentucky. The following chart shows the color of eartags on the cattle, if any, the amount each head brought at the sale and whether the cattle had a brand. Bill Chase, the auctioneer, testified that the only brand present on the cattle was the SSH brand. White eartags indicated CFB ownership. Chase's report on the auction was as follows:

| | # of cattle | Tag Color (if tagged) | Brand | Price |
|---|---|---|---|---|
| | 1 | yellow | | $ 910.00 |
| | 1 | blue | X | $ 960.00 |
| | 1 | color not identified | X | $ 1,043.70 |
| | 3 | | X | $ 3,475.00 |
| | 9 | calves | | $ 1,480.00 |
| | 31 | blue | | $ 34,595.00 |
| | 85 | white | | $ 86,697.57 |
| | 284 | white | X | $ 295,839.93 |
| TOTAL | 415 | | | $ 425,001.20 |

## LEGAL ANALYSIS

In its filings with the Court, Sunshine acknowledged that all unbranded cattle were subject to CFB's security interest. [*See*, p. 7 of Dkt. 408.]  The auctioneer's report states that of the 415 head, 126 were unbranded and are therefore not in dispute and are subject to CFB's security interest.

Sunshine contends that the fact that its brand was on 289 of the 415 sold is prima facie evidence of its ownership of those head.  KRS 253.060 states as follows:

> Brands appearing in the current edition of the state report, or supplements thereto, shall be prima facie evidence of ownership and takes precedence over brands of like and kind should the question of ownership arise.  An owner whose brand does not appear in the state report, or the supplement thereto, shall produce evidence to establish his title to the property in the event of controversy.

Sunshine's brand, however, was not registered nor did it become a part of the state report until January 2, 2013, well after the date the Petition was filed.  The record, at best, established that at one point, Debtor had every cow brought into his operation branded with the SSH brand, regardless as to who paid for the cows.  Further, in order for Sunshine to be able to rely exclusively on KRS 253.060 in support of its ownership claim, it could only apply to those cattle branded after

-21-

the date of the registration of the brand. There is no reliable evidence of record as to how many head were branded with the SSH brand after January 2013 and the date Debtor was removed as Debtor-in-possession in March 2013. In any event, the presumption of prima facie evidence of ownership was rebutted by Debtor's testimony.

In its Opinion remanding this matter, the Sixth Circuit stated that CFB had the burden of proof on establishing that the Dairy Cow Leases were something other than actual leases and that it failed to prove that the "actual economics of the transaction demonstrate that the leases were security agreements." On remand, this Court determined that both parties bore an equal burden on establishing ownership of the cattle auctioned. In the light most favorable to Sunshine, its best evidence of ownership was the existence of its brand. However, the evidence was not probative due to Debtor's credible evidence on over branding of cattle, and that the SSH brand was not registered until January of 2013. Absent evidence of registration of the brand at the time the leases were executed or even later, at the time the cattle were actually branded, Sunshine had to prove its ownership by the preponderance of the evidence. Sunshine failed to carry this burden.

Despite the presence of the brands and eartags, the Court cannot conclude with certainty the ownership of these cattle solely on these markings. The Court's factual findings above clearly demonstrate that the funds used to purchase cattle, meant to be subject to Sunshine's Leases as well as replacement cattle, were purchased with commingled funds in Debtor's CFB account. This evidence is critical to determining the parties' rights in the cattle and therefore attachment of CFB's security interest to the cattle.

The Security Agreement executed between Debtor and CFB covered after acquired property. There is no dispute that a security interest in after acquired property attaches when there is an

agreement that it attach, value is given and debtor has rights in the collateral. *In re Bush*, 159 B.R. 209 (Bankr. E.D. Ky. 1993); *First Nat. Bank of Arizona v. Carbajal*, 132 Ariz. 263, 645 P.2d 778, 782 (1982) and Unif. Comm. Code §9-203. The CFB Security Agreement specifically states that it covers "all . . . Equipment, Farm Products, [and] Livestock (including all increase and supplies). . . currently owned [or] hereafter acquired . . .." Value was given through the Notes secured by the security agreements. The parties' dispute, however whether the Debtor had sufficient rights in the collateral for a security interest to attach.

CFB relies on *Brown v. U.S. By and Through Farmers Home Admin. of Dept. of Agriculture*, 622 F.Supp. 1047, 1050 (D.S.D. 1985), for the proposition that it is the "outward appearance of the debtor's rights of ownership and control in the collateral that determines whether attachment of the security interest is effective and not the rights of the party who may have title to the collateral," as the determining feature in rights in the collateral. CFB also relies on *In re Williams*, 208 B.R. 882, 885 (Bankr. E.D. Ky. 1997), *Hubbard v. HomeBank of Arkansas*, 2011 Ark. App. 183, 382 S.W.3d 721, 726 (2011) and *In re Webb*, 520 B.R.748 (Bankr. E.D. Ark. 2014), in support of its claim that a debtor has sufficient rights in collateral for a security interest to attach, where the debtor maintained the collateral, cared for the collateral and profited from its use.

Debtor identified himself as the owner of the cattle on his Voluntary Petition and listed CFB as a secured creditor and Sunshine as an unsecured creditor. The evidence also supported Debtor's claim to ownership of the herd based upon his tax returns which showed that Debtor depreciated the value of the cattle on those tax returns.[1]

---

[1]Sunshine did not offer any evidence that it carried the leased cattle on its books as assets or claimed depreciation of the cattle on its returns.

Sunshine, however, relies on a line of cases including *National Livestock Credit Corp. v. First State Bank of Harrah*, 503 P.2d 1283 (Okla. App. 1972); *In re Cook*, 63 B.R. 789 (Bankr. Bankr. D.N.D. 1986); and *Rohweder v. Aberdeen Production Credit Assoc.*, 765 F.2d 109, 113 (8th Cir. 1985), in support of its claim that a debtor possesses sufficient rights in collateral if the true owner consents to the debtor's use of the property as security or if the true owner is estopped from denying the creation of the security interest. Sunshine contends the evidence supports its claim that CFB's security interest could never attach to the cows under its Leases because the intent of all parties involved was that the cattle would always remain the property of Sunshine and Debtor could not encumber this property.

The facts of this case, however, are distinguishable from the cases relied upon by Sunshine. Here, under each of the Leases in issue, the cattle were delivered to Debtor's farm, incorporated into his operation and were being fed, cared for and producing milk before Sunshine even had a signed lease with the Debtor. More importantly, in some instances, third parties provided the cattle to Debtor and Debtor was the party actually providing the funds for the initial purchase of the cattle, funds which came out of the CFB account and constituted its collateral. The evidence is undisputed that the CFB account was the only account used by Debtor in its dairy operation and into which he deposited funds received from culled cow sales and milk proceeds. Debtor also used funds from this account to buy replacement cattle and to advance funds to third party purchasers, such as Shoemaker, Branstetter and Kuennan.

The Court finds the facts of this case are most like those in *Brown* rather than the *National Livestock* and *Cook* cases. In *Brown*, Markesun, the debtor, had entered into several security agreements with FMHA which granted FMHA a security interest in "all livestock . . . now owned

-24-

or hereafter acquired by debtor, together with all increases, replacements, substitutions and additions . . . ." Subsequent to execution of the security agreements, debtor entered into an agreement with the plaintiff, Brown, whereby Brown sent debtor a check for $20,000 which debtor deposited into his checking account. Debtor then used funds from his checking account to purchase 50 cattle, none of which ever had a brand, but were placed on his property with his other cattle. Debtor and Brown orally agreed that debtor would sell the 50 cattle and split the profits. Debtor had full discretion regarding the sale, even though both debtor and Brown testified that Brown owned the cattle. Later all of debtor's cattle were sold after FMHA sought to liquidate debtor's cattle operation. All checks from the sale went to FMHA. Brown then sued FMHA seeking return of his $20,000 from the sale.

The appellate court affirmed the lower court's judgment in favor of FMHA finding there was no evidence of delivery of the 50 cattle to debtor sufficient to establish a bailment which would have prevented attachment of FMHA's security interest. The court stated:

> Moreover, no constructive delivery can be established since the $20,000 check received by Markesun was placed in his own account. (T. 32). Since Brown's check was commingled with Markesun's funds and was in no way traceable to the cattle purchased by Markesun, Brown retained no ownership interest in the cattle sufficient to establish a bailment.

*Id.* at 1049. Similarly, use of the commingled funds in the CFB account served to establish Debtor's rights in the cattle sufficient for CFB's lien to attach.

Sunshine claims that all parties were aware of Sunshine's lease interest in the cattle. In the *Brown* case, both Brown and Markesun testified that Brown was to own the cattle, however, on this point the court stated,

> Such testimony is nevertheless outweighed by evidence of almost unbridled discretion allowed and exercised by Markesun in the purchase and sale of the cattle.

-25-

*Id.* Even if *Brown* had established ownership, the court gave it very little weight for purposes of
establishing debtor's "rights in the collateral" sufficient for a security interest attach.  The court
stated,

> Even if the plaintiff had established ownership of the cattle, the court is unconvinced
> that a third party's ownership interest in collateral bears any substantial weight in
> determining a debtor's "rights in collateral" for purposes of attachment of a security
> interest.  The official comment to §9-202 states unequivocally that "[t]he rights and
> duties of parties to a security transaction and of third parties are stated in this Article
> without reference to the location of 'title' to the collateral".  Even if a party retains
> ownership interest in a piece of collateral, a debtor who retains that collateral is still
> able to mislead potential creditors by exercising his "rights" of possession and
> control over the collateral.  It is the outward appearance of a debtor's rights of
> ownership and control in the collateral that determines whether attachment of the
> security interest is effective and not the right of a party who may have title to the
> collateral.

*Id.* at 1050.  *See also In re Joy*, 169 B.R. 931, 936 (Bankr. D. Neb. 1994) (where debtor in contract
feeding arrangement for hogs had rights in collateral sufficient for bank's security interest to attach,
where hogs were in his possession, where he raised or paid for the hogs and contract allowed debtor
to control the terms of the sale of the hogs).

Sunshine relies on the testimony of Branstetter and Layton to establish that all parties knew
the cattle being purchased were for use under the Sunshine Leases and owned by Sunshine.  CFB
did indeed know that Debtor had cattle under lease with Sunshine.  However, there was no evidence
that CFB was aware or that it ever consented to the use of its collateral in the CFB account to fund
the purchase of those cattle.  The Court deems this to be the critical point where Debtor acquired
rights in the collateral sufficient for CFB's security interest to attach to those cattle.

The Court starts with the premise that the Dairy Cow Leases were true Leases.  However,
the parties did not comply with the terms of the Lease which constituted material breaches of the
Lease.  Had Sunshine simply followed the terms of the Dairy Cow Leases that it drafted, particularly

those terms related to culling, branding, sales of culled cattle and replacement cattle, Sunshine could have reliably traced the cattle it owned under the Leases. Sunshine could also have required the Debtor to set up a separate bank account used solely for the deposit of funds received from sales of culled cows and calves and funds used to purchase replacement cows subject to its Leases. This would have prevented the commingling of funds in the CFB account. Finally, Sunshine could have registered its brand with the state prior to placing the brand upon any cattle supplied under the Leases. As between Sunshine and CFB, Sunshine could have prevented the problems now facing the Court by simply following the terms of its own Leases and insisting on Debtor's compliance.

Blevins, a sophisticated businessman in the cattle industry, testified that he was fully aware of CFB's prior perfected security interest at the time he entered into the Leases with Debtor. A prudent creditor under such circumstances would have entered into an Inter-Creditor Agreement with CFB or have CFB execute a Subordination Agreement which would have clearly defined the parties' rights and obligations. Sunshine was clearly in the best position to adequately protect its own interests under the Leases.

The *Cook* case, relied upon by Sunshine specifically stated that the distinguishing feature between *Cook* and *Brown* was that the plaintiff's money in *Brown* was "commingled in the debtor's account prior to the purchase of the cows and thus no ownership interest in plaintiff was ever established sufficient to establish a bailment." *Id.* at 797. In *Cook*, the debtor's brother's cattle were commingled with the debtor's cattle after his brother had directly purchased them. The brother's cattle all contained permanent ear tattoos of the animal's identification number listed on the American Angus Association registry. Also, the debtor in *Brown* had unbridled discretion in the purchase and sale of cattle, much like the Debtor here. Although the terms of the Lease prevented

-27-

Debtor from having unbridled discretion in the sale of culled cattle and calves, in practice, this was the case. It was the Debtor's unbridled discretion in selling calves, culling cattle, and buying replacements with funds in the CFB account for both practices that makes the cases relied upon by Sunshine inapplicable herein.

The reason that the Uniform Commercial Code requires a debtor to have "rights in the collateral" for a security interest to attach is because "one cannot encumber another man's property in the absence of consent, estoppel or some special rule." *First Nat. Bank & Trust Co. of Augusta v. McElmurray*, 120 Ga. App. 134, 169 S.E.2d 720, 724 (1969). Blevins testified at the first trial and during this trial that he did not think that his Lease Agreement took precedence over CFB's prior perfected security interest. CFB representatives testified that they were aware that Debtor had cattle subject to Sunshine's Lease. However, CFB had no knowledge that Debtor had commingled funds in his CFB account which were used to fund the purchase of cattle under the Leases, nor was it aware that Debtor and his employees were branding all cattle that came upon the farm in the latter part of 2012 with the SSH brand regardless of their ownership.

The Court therefore, concludes that the Debtor acquired rights in the collateral at the time funds were used out of the CFB account for their purchase, regardless of the fact that the funds were later reimbursed by Sunshine. As the above authority indicates, it is the Debtor's rights of ownership and control in the collateral that determines whether attachment of the security interest is effective, not whether title to the collateral rests in another party.

The Court concludes that based on the testimony of record regarding how the cattle were purchased, as well as how the replacement cattle were purchased, CFB's security interest attached to all of these cattle before Sunshine ever acquired any rights in the cattle. Debtor testified that at

-28-

the time the Petition was filed, all cattle under the Sunshine Leases had been sold.  This makes sense considering the testimony that Debtor sold approximately 250 head of cattle between September and November 2012.

Since money received from culled cattle and calve sales was placed in the CFB account and replacement cattle were purchased with checks drawn on the CFB account (which also contained proceeds from milk sales), the account contained commingled funds of CFB and Sunshine.  Blevins acknowledged that Sunshine did not "jump ahead of the bank on after acquired cattle."  (Doc. #123, p. 144-145).  CFB's security interest had priority on the after acquired cattle also.

Debtor also purchased 84 head of cattle from Mike Hatcher on June 24, 2012.  Debtor wrote checks for these cattle out of the CFB account and also agreed to pay for the cattle by way of monthly milk assignments.  The checks as well as the milk assignment funds were subject to CFB's security interest.  Therefore, when Hatcher, who removed 42 of the cattle in violation of the automatic stay, returned the 42 head of cattle post-petition, those cattle were also subject to CFB's lien.  Although Sunshine claims 39 head had its brand, the Court already determined that due to over branding by Debtor and his employees and use of CFB's funds for the purchases, these cattle were also subject to CFB's lien.

Finally, because 415 head of cattle were auctioned in April 2013, there were approximately 26 additional head of cattle purchased and placed on the farm post-petition.  The Court determines that these additional cattle were also subject to CFB's lien.  Under 11 U.S.C. §552(a), property acquired post-petition by a debtor is ordinarily not subject to any lien resulting from a pre-petition security agreement.  However, where property is acquired by the estate post-petition and is the "proceeds, product, offspring, rents or profits" of secured pre-petition property, then such proceeds,

products, offspring, rents or profits remain subject to the security interest. *See*, 11 U.S.C. §522(b) and *In re Wiegmann*, 95 B.R. 90, 92 (Bankr. S.D. Ill. 1989). The pre-petition security agreement executed by Debtor and CFB extended to the after acquired livestock, since they were the proceeds of the CFB's pre-petition lien. Therefore, these cattle were also subject to CFB's lien.

## **CONCLUSION**

For all of the above reasons, the Court finds that all cattle sold at the auction in April 2014 were subject to CFB's security interest. Therefore, the Court determines that all the proceeds of the auction, less the Trustee's fee, the costs of care and feeding of the cattle and expenses related to the sale, are the property of CFB. An Order incorporating the findings herein accompanies this Memorandum-Opinion.

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  September 2, 2015

-30-

**UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**WESTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LEE H. PURDY | ) | CASE NO.  12-11592(1)(12) |
| | ) | |
| _____ Debtor(s) | ) | |

**<u>ORDER</u>**

This matter came before the Court on February 25, 2015 for hearing on the following pretrial motions of Citizens First Bank ("CFB") and Sunshine Heifers, LLC ("Sunshine"):

1.     Motion of CFB for the Court to Enter an Order that Doc. Nos. 177, 178, 204, 329 and 354 are Final and Non-appealable and that the Court's Review is Limited to Doc. No. 150.  (Dkt. No. 394).

2.     Motion of CFB for the Court to Enter an Order that if Sunshine can make Arguments as to the Proceeds, Sunshine is Barred from Raising Any Arguments as to Costs and Fees as Established by the Law of the Case.  (Dkt. No. 395).

3.     Motion of CFB for the Court to Enter an Order Finding that Sunshine Bears the Burden of Proof on Remand.  (Dkt. No. 396).

4.     Motion of Sunshine for the Court to Enter an Order that Establishes the Court's Procedural Authority for Granting Sunshine's Request for a Money Judgment.  (Dkt. No. 413).

The Court being duly advised in the premises,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Motions Nos. 1 and 2 referenced above of CFB, be and hereby are, **GRANTED IN PART AND DENIED IN PART** in accordance with the accompanying Memorandum-Opinion.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Motion No. 3 referenced above of CFB, be and hereby is, **DENIED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that as to Motion No. 4 of Sunshine referenced above, be and hereby is, **GRANTED**.

So Ordered this 1ˢᵗ day of September, 2015.

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  September 2, 2015

-2-

# UNITED STATES BANKRUPTCY COURT
## FOR THE
## WESTERN DISTRICT OF KENTUCKY

IN RE:                                )
                                      )
      LEE H. PURDY                    )          CASE NO.  12-11592(1)(12)
                                      )
                  Debtor(s)      )

## ORDER

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that net sales proceeds, exclusive of all costs associated with the sale and care of the cattle sold, totaling $402,354.54 are awarded to Citizens First Bank.

This is a final and appealable Order.  There is no just reason for delay.

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  September 2, 2015